UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

ATHEA ELIZABETH BELL )
MANUEL, *et al.*, )
 )
      Plaintiffs, )
 )
v. ) 1:11-cv-00357-DBH
 )
CITY OF BANGOR GENERAL )
ASSISTANCE, *et al.,* )
 )
      Defendants )

## RECOMMENDED DECISION

Pro se Plaintiffs Athea Manuel and her father, Gary Manuel, have been granted leave to proceed in forma pauperis. However, a review of their pleadings demonstrates that the Manuels have failed to state a claim on which relief may be granted, making it appropriate to dismiss the case pursuant to 29 U.S.C. § 1915(e)(2)(B)(ii).

### BACKGROUND

Plaintiffs Athea Manuel and her father, Gary Manuel, filed a complaint against multiple defendants, alleging one form or another of discrimination in the provision of public services funded with federal dollars. Also named as plaintiffs in their complaint are Peter Banks Manuel and Maverick Banks Brown Manuel. Athea and Gary have received permission to proceed in forma pauperis. The other plaintiffs have not received a similar status as neither has signed the complaint, assuming either is of adult age, and the pleadings are not styled to present claims by Gary on behalf of minor dependents. The complaint bears a striking resemblance to the complaint filed in case number 1:09-cv-339-DBH and, indeed, many of the allegations repeat allegations from that earlier litigation. The earlier litigation concluded with judgment entering in

favor of numerous defendants, most of whom are now named, once again, in this litigation. The First Circuit Court of Appeals affirmed the entry of judgment September 1, 2011.

Plaintiffs filed the instant action September 22, 2011. On September 27, 2011, the court issued an order to show cause, instructing Plaintiffs to provide the ages of the Manuel sons and/or IFP applications signed in their names. Additionally, the court instructed Plaintiffs to explain how this matter is different from the earlier action filed by Gary Manuel and his wife, Eunice Manuel. Gary Manuel responded to this order on October 12, 2011, and represents that his claims are new claims based on events in 2010 and 2011. These new allegations are discussed below. The redundant allegations are not considered because they are barred by the judgment in the prior action.

As for Athea Manuel, she was not a plaintiff in the prior action. The instant complaint reveals that she turned 18 in February 2011 and wishes to assert her own claims based on the allegations previously advanced by her parents. She contends that Defendants caused her to languish as a child and deprived her of a positive childhood experience by not giving more services or by denying certain services to the family. (Compl. ¶ 75.) According to the current complaint, all of the economic difficulties and hardships the Manuels have experienced since moving to the Bangor area in 2004 have arisen because Defendants and others have harbored discriminatory animus against the family based on the fact that Gary Manuel is a black man with alleged disabilities who wears dreadlocks in his hair. (Id. ¶ 92.) Athea believes she may resurrect her father's foreclosed claims from the earlier time period because she was a dependent at the time and now, as an adult, has an ability to pursue them in her own name. (Id. ¶¶ 6, 7.) Athea also identifies herself as a black woman with disabilities. (Id. ¶¶ 2, 11.) In addition to this attempt to renew her father's failed claims, Athea also alleges that the Maine Bureau of Motor

Vehicles discriminated against her when it failed to award her a driver's license following a driving test. (Id. ¶ 69.)

## DISCUSSION

Athea Manuel's attempt to resurrect her parent's bygone claims falls short. Her allegations against the Maine Bureau of Motor Vehicles and her claims about more recent treatment accorded to the family by the public defendants all suffer from the fact that Athea and Gary Manuel wish to hold municipal and state departments accountable for alleged mistreatment by front line employees, without alleging any attempt to inform persons with supervisory oversight of the alleged discriminatory acts. But more significantly, even where allegations are offered concerning the statements or decisions of supervisory officials, the limited factual allegations do not provide a plausible basis to infer discriminatory animus toward Athea or Gary Manuel based on a race or disability. This shortcoming extends equally to the allegations pertaining to B&L Properties.

### A. Sua Sponte Dismissal Standard

The federal in forma pauperis statute, 28 U.S.C. § 1915, is designed to ensure meaningful access to the federal courts to those persons unable to pay the costs of bringing an action. However, in recognition of the fact that a waiver of fees encourages some individuals to file suit regardless of the merits, the statute authorizes the court to dismiss actions that fail to state a viable claim or present frivolous, malicious, or repetitive claims. Id. § 1915(e)(2)(B). "Dismissals on these grounds are often made sua sponte prior to the issuance of process, so as to spare prospective defendants the inconvenience and expense of answering such complaints." Neitzke v. Williams, 490 U.S. 319, 324 (1989).

When deciding whether to dismiss a claim or action for failure to state a claim, the court must accept as true the factual allegations of the complaint, draw all reasonable inferences in favor of the plaintiff that are supported by the factual allegations, and determine whether the complaint, so read, sets forth a plausible basis for recovery. Trans-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F.3d 315, 320 (1st Cir. 2008). However, to properly allege a civil action in federal court, it is not enough merely to allege that a defendant acted unlawfully; a plaintiff must affirmatively allege *facts* that identify the manner by which the *defendant(s)* subjected the plaintiffs to a harm for which the law affords a remedy. Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).

When the plaintiff is a pro se litigant, the court will review his or her complaint subject to "less stringent standards than formal pleadings drafted by lawyers." Haines v. Kerner, 404 U.S. 519, 520 (1972). Additionally, the pleadings of pro se plaintiffs are generally interpreted in light of supplemental submissions. Wall v. Dion, 257 F. Supp. 2d 316, 318 (D. Me. 2003). In some circumstances, if it appears that a pro se litigant might be able to plead adequate facts if he or she better understood the applicable law, the Court may provide some opportunity to understand what the law requires, along with an opportunity to supplement the pleadings, all in order to avoid a scenario in which a pro se plaintiff's claims are summarily dismissed with prejudice based on a failure to plead sufficient facts. Rodi v. S. New Eng. Sch. of Law, 389 F.3d 5, 20 (1st Cir. 2004); Cote v. Maloney, 152 Fed. Appx. 6, 8 (1st Cir. 2005) (not for publication).

Before turning to the issue of whether Plaintiffs have stated viable claims in their complaint, it must be observed that their complaint contains several extraneous factual allegations that have nothing whatsoever to do with Defendants. For some reason, despite limiting their action to the identified Defendants, the Manuels pepper their complaint with far-

4

ranging conspiratorial allegations concerning their electric service, telephone service, cellphone service, and internet service, a mechanic who worked on their car, bullies, private employers, rude neighbors, and strangers who have given them a hard time, including cyber-stalkers and peeping toms. None of these allegations can fairly be laid at the door of Defendants. Defendants are not responsible for all of the incivility that the Manuels have allegedly endured while residing in Bangor, Maine.

**B.    Athea Manuel's Claims**

Minority tolling provides an opportunity for an individual to pursue claims for harms inflicted during childhood, even though the claims would ordinarily be time barred. See Kennedy v. Town of Billerica, 617 F.3d 520, 526 (1st Cir. 2010); 14 M.R.S.A. § 853.[1] This discussion assumes that the tolling provision applies with respect to civil rights claims that are redundant of the claims brought by Gary and Eunice Manuel in the prior litigation. A review of the current pleadings reflects the mere duplication of the prior pleadings and the addition of Athea Manuel as a plaintiff. All of the pleading deficiencies identified in the prior proceeding remain.

For the reasons indicated in the recommended decisions and orders adopting the same in the prior litigation, I recommend that the Court dismiss those of Athea Manuel's claims that piggyback on the claims previously advanced by her father and dismissed on the merits. (Case No. 1:09-cv-339-DBH: Doc. No. 28 (recommending dismissal of claims against the Maine Department of Motor Vehicles given the absence of any allegation of bureau indifference to allegations of discrimination on the part of front-line employees); Doc. No. 31 (recommending dismissal of claims against the Rural Department and Penobscot Community Health Center that

---

[1] Maine common law does not recognize claims premised on a child's loss of parental consortium due to alleged violations of a parent's rights. Durepo v. Fishman, 533 A.2d 264, 264 (Me. 1987). However, Athea Manuel's claims are not common law tort claims.

were asserted based on federal statutes that do not apply under the circumstances); Doc. No. 67 (recommending dismissal of Title VI claim and Rehabilitation Act claim against Penobscot Community Health Center for failure to state a claim and dismissal of Title II and Title VI claims against the City of Bangor General Assistance and Park Woods programs for failure to state a claim); Doc. No. 72 (Woodcock, J., order adopting recommended decisions); Doc. No. 106 (recommending dismissal of discrimination/accommodation claims against the Bangor Area Homeless Shelter for failure to state a claim; dismissal of discrimination/accommodation claims against B&L Properties for failure to state a claim; and dismissal of discrimination/ accommodation claims against Penquis Community Action Program for failure to state a claim); Doc. No. 112 (Hornby, J., order adopting recommended decision).)[2]

Among the claims dismissed in the prior litigation, there were also claims advanced under the Fair Housing Act and Equal Credit Opportunity Act against the Rural Department and

---

[2] Of the various statutes cited in the complaint, the federal statutes that actually have some application all require plausible allegations of discriminatory bias or some reasonable explanation about what kind of accommodation would be appropriate in the administration of public programs. As for a damages claim under Title II of the Americans with Disabilities Act, there must be exclusion from participation or denial of benefits "by reason of" disability. 42 U.S.C. § 12132. Likewise, Title VI of the Civil Rights Act of 1964 requires exclusion or denial "on the ground of race, color, or national origin." 42 U.S.C. § 2000d. The Rehabilitation Act is consistent with these statutes and requires evidence of exclusion or denial "solely by reason of her or his disability." 29 U.S.C. § 794. The Fair Housing Act similarly prohibits discrimination "because of race, color, religion, sex, familial status, or national origin" and "because of a handicap." 42 U.S.C. § 3604. The Equal Credit Opportunity Act prohibits discrimination "with respect to any aspect of a credit transaction[,] on the basis of race, color, religion, national origin, sex or marital status, or age." 15 U.S.C. § 1691(a)(1). Discriminatory intent is also the divining line for race discrimination claims brought under 42 U.S.C. § 1981, Gen. Bldg. Contractors Ass'n v. Pa., 458 U.S. 375, 388 (1982); Alexis v. McDonald's Rest. of Mass., Inc., 67 F.3d 341 (1st Cir. 1995), or for equal protection claims advanced under 42 U.S.C. § 1983, Ortega Cabrera v. Bayamon, 562 F.2d 91, 103 (1st Cir. 1977).

A person pursuing a claim for denial of reasonable accommodation in relation to public programs or activities must provide some factual content in a complaint that divulges what accommodation was requested and how it relates to the disability and program in question. Cf. Lyons v. The Legal Aid Society, 68 F.3d 1512 (2d Cir. 1995) (considering motion to dismiss in light of allegations demonstrating request for particular accommodation); McWright v. Alexander, 982 F.2d 222, 226-27 (7th Cir. 1992) (involving similar discussion in the context of an employment-related claim). Without such information there is no way to assess that denial of participation or benefit occurred because of disability.

Additionally, where the governmental agency is sued based on the conduct of lower-level employees, there must be an indication that the agency received notice of harm to a federally protected right and an opportunity to rectify the situation, but failed to take reasonable measures to ensure compliance. Wills v. Brown Univ., 184 F.3d 20, 41 (1st Cir. 1999); Duvall v. County of Kitsap, 260 F.3d 1124, 1139 (9th Cir. 2001).

Penquis Community Action Program in connection with Gary and Eunice Manuel's effort to obtain financing for a home purchase in 2006. The dismissal of those particular claims was based on the existence of a two-year statute of limitations. (See Doc. No. 67 at 7; Doc. No. 106 at 9-10.) That aspect of the prior litigation requires additional discussion in the context of Athea's theory that she has a derivative loss of consortium claim for loss associated with the parents' failure to secure a family home, which allegedly survives the dismissal of her parents' claims because of minority tolling. The idea is that Athea and the other Manuel children were harmed because their parents were not approved for financing of a home purchase. The proposition that a child has a loss of consortium claim under the Fair Housing Act or the Equal Credit Opportunity Act has no legal grounding that I can identify. Moreover, Congress has enacted federal statutes of limitation for both the Fair Housing Act, 42 U.S.C. § 3613, and the Equal Credit Opportunity Act, 15 U.S.C. § 1691e(f),[3] and neither provision provides a rule of minority tolling, quite possibly because the idea of a minor maintaining a claim based on a parent's failure to obtain credit was beyond the contemplation of Congress. Minority tolling based on incorporated state law, in other words, is unavailable under these particular acts. In any event, in the final analysis, like the other claims discussed herein, the allegations of discriminatory bias on the part of the Rural Department and Penquis Community Action Program are wholly conclusory and do not provide a plausible basis for inferring that the Manuel parents were denied financing *because* members of the family are black or *because* Gary Manuel

---

[3]     In 2010, pursuant to the Consumer Financial Protection Act of 2010, Congress amended the ECOA limitation period and made it five years rather than two. Act of July 21, 2010, Pub. L. No. 111-203, § 1085(7). The effective date of this change is July 21, 2011. Id. §§ 1062, 1100H, 1495; 75 Fed. Reg. 57252 (Sept. 20, 2010). As of 2006, when the Manuels sought financing, the limitation period was two years and provided that "*no* action" could be brought beyond the limitation period. 15 U.S.C. § 1691e (2006) (emphasis added). Similarly, the Fair Housing Act's two year limitation period applies to any "aggrieved person"; there is no exception for minors. 42 U.S.C. § 3613(a)(1)(A). Thus, however appropriate it might be to contemplate a civil rights loss of consortium claim by a minor in some other civil rights context for which state limitations and tolling provisions might apply, there is no basis to entertain that theory in the context of either the Fair Housing Act or the Equal Credit Opportunity Act.

has a disability.  The fact that Gary Manuel is black, has a disability, and wears dreadlocks in his hair does not warrant an assumption that he or Eunice Manuel were denied credit because of Gary Manuel's race and/or disability.

As for Athea Manuel's claim that race or disability discrimination influenced the decision to fail her in her driver's license road test, the allegations are inadequate to support a plausible inference that the Maine Bureau of Motor Vehicles exhibited deliberate indifference toward any civil rights deprivation or allegation of the same (assuming the conclusory allegations are even sufficient to infer discriminatory animus on the part of the local examiner).  As indicated in a recommended decision in the prior litigation, claims of institutional discrimination in the provision of public services, programs, and activities require a showing of deliberate indifference on the part of the institution or agency in question and this cannot be inferred based merely on the actions of lower-level employees.  (Case No. 1:09-cv-339-DBH: Doc. No. 28 at 5-6.)

The balance of Athea Manuel's allegations appear to parallel those of her father, Gary Manuel, insofar as both complain about separation of the family on account of eviction from their apartment and due to the fact that Bangor provides different homeless shelters for adults and children.  These claims are discussed in the following section addressed to Gary Manuel's new claims.

**C.      Gary Manuel's New Claims**

Gary Manuel has supplemented his pleadings, as required by the show cause order, to identify what new allegations are buried in the 94-page complaint.  He outlines the new claims as follows:

*Defendant B&L Properties*

According to the allegations, B&L Properties evicted the Manuel family from their apartment in October 2010 and refused to accept a Section 8 voucher and other rent money when it was offered in payment of rent. According to the allegations, B&L Properties gave the Manuels notice of non-payment of rent and the notice allowed for payment within 15 days. Gary Manuel alleges that he tendered payment in this timeframe but, unlike similar late payments from white tenants, his late payment was not accepted by B&L Properties. (Response to Order to Show Cause ¶ 2.)

Other than his general allegations regarding his race and disabilities, Gary Manuel offers absolutely no factual predicate upon which to base a claim that B&L Properties made the decision to evict his family based upon either race or disability. The allegations in this case and the prior proceeding reflect that B&L Properties has maintained a rental relationship with the Manuels since sometime in 2006, despite a contretemps between the Manuels and B&L Properties in late 2004. (See Case No. 1:09-cv-339-DBH: Doc. No. 106 at 4.) This appreciable rental relationship of roughly three years duration is indicative of acceptance of the Manuels regardless of their color and the presence of family members with disabilities. Moreover, the fact of the Section 8 overlay is further indicative of B&L Properties' acceptance of disabled persons. It was certainly unfortunate for the entire family that B&L Properties exercised its right to evict the Manuels for non-payment. However, as unfortunate as that might have been, the allegations simply fail to invite a plausible inference that B&L Properties exercised that right *because* the Manuel family has members who are black and disabled.

*Bangor General Assistance*

Following eviction from B&L Properties, the Manuels sought housing through the City of Bangor's General Assistance Program. According to Gary Manuel, he spoke with the director of the program and was told that a family homeless shelter was not available in Bangor; that Gary did not qualify for the City of Bangor to pay for his family to move as a unit into a hotel because his disability income is too high; and that shelter could be provided to the members of the family if the Manuels were willing to have the children stay in a shelter different from the shelter provided to the parents. (Id. ¶ 3.) According to Gary Manuel, the director told him that exceptions had been made in the past (allegedly assistance had on occasion been given to other families as a unit despite evidence of income above the applicable guideline) and Gary complains that his family did not receive special treatment. (Id.)

The complaint merely divulges that certain members of the Manuel family are black and have some unspecified mental health conditions and/or learning disabilities. There is no factual content in the complaint that would tend to support the requested inference that Bangor General Assistance treated the Manuels differently than any similarly situated family *because* members of the family are black or *because* members of the family may have disabilities. The mere conclusory allegation that the family has been subjected to disparate treatment based on discriminatory animus is not sufficient to state a civil rights claim against the City of Bangor General Assistance Program.

*Bangor Area Homeless Shelter*

The Manuels accepted shelter from the City. Gary complains of treatment he received while staying in the shelter. He says that he was denied a voucher for free laundry, but that it was explained to him that he did not qualify for a voucher due to his income. Gary complains

10

that he was kicked out of the shelter for six days for visiting his daughter in another shelter and remaining overnight there. Evidently recognizing the seriousness of his infraction, he argues that he could not make his way back to the adult shelter that evening because it was dark out and he has glaucoma. He contends, therefore, that it was disability discrimination to punish him for this infraction. Gary Manuel's allegations indicate that he went to his daughter's shelter after 6:00 p.m. on a mid-November evening. (Id. ¶ 4.) At that time of year the sun sets at approximately 4 p.m. Mr. Manual does not explain how he could walk to his daughter's shelter in the dark but not return in the dark.

Gary later suffered a 72-hour exclusion from the shelter for using an improper exit door. He says he saw a white occupant use the door in the presence of a staff member who said nothing to that white occupant. He also reports that he had some difficulties getting himself up and out by 6:30 a.m., which caused a security guard to admonish him, but that the staff and he arranged for a wake-up call at 5:00 a.m. and he agreed he would thereafter leave the sleeping quarters by 6:30 a.m. along with everyone else. (Id. ¶ 5.) According to the supplemental pleadings, on December 7, 2010, the director of the shelter told Gary and his wife, Eunice Manuel, that they were not welcome to remain at the shelter after a December 5 incident in which Gary Manuel complained about finding one of his bags unzipped, though he did not know if anything was missing. (Id.)

The allegations reflect that the City of Bangor supplied Gary Manuel with shelter and that he was not compliant with the rules imposed by the shelter on multiple occasions. In the absence of any allegations of municipal/institutional acceptance or encouragement of disparate treatment based on race and/or disability, these allegations do not warrant an inference that the expulsion of Gary and Eunice Manuel from the adult homeless shelter occurred *because* Gary Manuel is

11

black or *because* he has some unidentified mental health condition or learning disability. Nor do the allegations provide any meaningful insight into what kind of reasonable accommodation might be expected under the circumstances.

*Penobscot Community Health Care and the Hope House*

After their stay in the shelter, Gary and Eunice Manuel came to stay at the Hope House, a homeless shelter administered by Penobscot Community Health Care. Presumably, this placement was possible because of mental health conditions referenced by Gary Manuel in his pleadings. Gary Manuel complains that someone destroyed or stole certain items of property, that other clients of the program said unpleasant things and wandered about at all hours of the night, and that someone spoke of killing "niggers" on December 28, 2010. (Id. ¶ 6.) On that day, according to Gary Manuel, a client of the program repeatedly touched his buttock and kissed him. (Id. ¶ 7.) This client also called Eunice Manuel a bitch. Staff separated this individual from the Manuels, but the individual reappeared later to harass the Manuels. (Id.) According to Gary Manuel, someone made suggestions that Gary and Athea were associating with terrorists. (Id.) Gary Manuel describes this treatment as a "psychological operation." (Id.) At some point during their stay, Athea Manuel, presumably during a visit to see her parents, was hit on the head with a football. (Id.)

It is easy to imagine a white client making allegations commensurate with those presented by Gary Manuel and Athea Manuel. The one difference, of course, is the allegation that some unidentified individual spoke of killing "niggers." Nevertheless, there is no allegation that any staff member at the Hope House made such a statement. These allegations are inadequate to raise a plausible inference that the Hope House harbors an institutional bias against clients who are black. Insofar as the Hope House administers services for a population with

12

mental health needs, there is no plausible basis on these allegations to infer discriminatory bias against persons with mental disabilities.

Gary Manuel also complains that he was denied service by Penobscot Community Health Center at its Union Street clinic in the fall of 2009 and was given the explanation that his former doctor no longer worked there and no other doctor would accept him as a patient. (Compl. ¶ 39.) The complaint in the prior action demonstrates that the Center provided services to Gary Manuel in the past and that he had a conflict with a physician related to the physician's medical advice. This background demonstrates that the Center does not turn away clients *because* they are black or *because* they have mental health problems. The allegations plausibly suggest a disinclination to deal with Gary Manual as an individual, based on a history of past interaction. The allegations do not plausibly suggest that the Center harbors discriminatory animus toward those patients who are black and/or disabled. Nor do they sketch out a plausible failure to accommodate scenario.

*Bangor Area Transit*

Gary Manuel supplements his original pleading with a description of alleged mistreatment in December 2010 and January 2011 by one or more bus drivers working for the City of Bangor. (Response to Order to Show Cause ¶ 8.) These allegations do not support an inference of institutional bias, indifference, or failure to accommodate.

*The Cozy Inn*

Gary Manuel further supplements his pleadings by alleging negligence on the part of the Cozy Inn while the Manuel family rented a room for a few days at the end of 2010 to bring in the New Year together. (Id.) These supplemental allegations do not suggest discrimination on the basis of race or disability, failure to accommodate, or any other deprivation of a federal right.

13

## CONCLUSION

For reasons set forth above, I RECOMMEND that the Court DISMISS Athea and Gary Manuel's complaint for failure to state a claim. I also recommend that the complaints purportedly filed by Peter Banks Manuel and Maverick Banks Brown Manuel be dismissed because neither putative plaintiff has directly responded to this court's show cause order and none of the materials submitted by Athea or Gary Manuel shows good cause why the complaint should not be dismissed as to these two named plaintiffs.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

October 28, 2011